Daniel Feinberg - State Bar No. 135983
FEINBERG, JACKSON, WORTHMAN &
WASOW LLP
383 4th Street, Suite 201
Oakland, CA 94607
Telephone: (510) 269-7998
Facsimile: (510) 269-7994
E-mail: dan@feinbergjackson.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| VIKA BOYKO, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| PFIZER INC., MEDIVATION, INC. 2015 SEVERANCE PLAN, | |
| Defendants. | |

## **JURISDICTION**

1. Plaintiff Vika Boyko ("Plaintiff") brings this action for benefits, declaratory, injunctive, and appropriate equitable relief pursuant to Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a). This court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e) and (f), 29 U.S.C. § 1132(e) and (f), and 29 U.S.C. § 1331.

## **VENUE**

2. Venue lies in the Northern District of California pursuant to ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendant Medivation, Inc. 2015 Severance Plan ("the Plan") is

administered in part in this District by Defendant Pfizer Inc. ("Pfizer"), and because Defendants may be found in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

**INTRADISTRICT ASSIGNMENT**

3. This action should be assigned to the San Francisco/Oakland Division because the Plan is administered in part in San Francisco, and because some of the events or omissions giving rise to Ms. Boyko's claim occurred in San Francisco.

**PARTIES**

4. Plaintiff Vika Boyko is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan. Plaintiff was hired by Medivation, Inc. ("Medivation") in March 2016 as the Director of Digital and Non-Personal Marketing. After Pfizer acquired Medivation, Ms. Boyko remained in her position, but, as alleged below, there was a material reduction in Ms. Boyko's duties and responsibilities. Ms. Boyko voluntarily terminated her employment for "Good Reason" (as defined in the Plan) on June 15, 2017. Plaintiff resides in San Francisco, California.

5. Defendant Plan is a welfare benefit plan as defined by ERISA § 3(1), 29 U.S.C. § 1002(1), because it is a plan or program that was established or maintained by Medivation for the purpose of providing its participants with severance benefits. The Plan is now sponsored by Defendant Pfizer.

6. Defendant Pfizer is the successor in interest to Medivation. Defendant Pfizer serves as administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and is responsible for the overall administration of the Plan, including claims for benefits. Defendant Pfizer is a Delaware corporation with its headquarters in New York, New York. Defendant Pfizer also has extensive operations in California, including this District.

**FACTS**

7. Medivation established the Plan in or about 2015. Plaintiff was a participant in the Plan.

8. Plaintiff was hired by Medivation in March 2016 as the Director Digital and Non-Personal Marketing. Ms. Boyko was responsible for digital strategy and platform development, paid and earned digital media, building sales representative digital tools, development and support of all web properties, web analytics and emerging innovative channels for Medivation's entire product portfolio, including both XTANDI and Talazoparib.

9. At Medivation, Ms. Boyko was a team leader who managed a digital marketing budget of over $12 million. Ms. Boyko worked closely with Medivation's marketing partner, Astellas, and the leads of other department. Ms. Boyko played a key role in XTANDI digital marketing strategy, and also had responsibilities for launching Talazoparib.

10. Pfizer completed its acquisition of Medivation on September 28, 2016. Under the Plan's terms, this was a "Change in Control."

11. The Plan provides severance benefits in the event of a "Change in Control Termination," defined in relevant part as the "the voluntary termination by a Participant for Good Reason … upon or within 12 months after a Change in Control." The Plan defined "Good Reason" in relevant part as "[w]ithout the Participant's consent, … a material decrease in a Participant's duties or responsibilities (but excluding a change in title or reporting relationship)."

12. The Plan's definition of "Good Reason" also required a participant who had suffered a material decrease in duties or responsibilities to provide Medivation (or its successor) with notice within 30 days of the triggering event, and Medivation (or its successor) had 30 days thereafter to remedy the defect.

13. Following the "Change in Control", Ms. Boyko's duties and responsibilities were materially decreased without her consent. Following the Pfizer takeover, Ms. Boyko's role was reduced from a team leader with strategic responsibilities to an individual contributor who performed a tactical role. Her responsibilities no longer encompassed Medivation's entire portfolio; instead, her responsibilities were limited to XTANDI. At Pfizer, Ms. Boyko's job duties and responsibilities closely resembled the role performed by her former direct report at Medivation,

14. At Medivation, Plaintiff was a marketing team leader and supervised a direct

report. At Pfizer, Ms. Boyko was no longer a team leader and she had no direct report.

15. Ms. Boyko's marketing responsibilities were materially diminished following the Pfizer acquisition. She spent much less time on marketing strategy duties because much of her time was taken up by administrative and tactical duties that were formerly done by her direct report, who resigned in March 2017 and was not replaced by Pfizer. In short, Ms. Boyko was no longer a team leader responsible for strategic oversight at Pfizer; instead, she was an individual contributor who carried out directives that came from the New York office of Pfizer.

16. Of the 20 projects Ms. Boyko was working on at the time she resigned from Pfizer in June 2017, her direct report was originally working on 17 of them before she left Pfizer in March 2017.

17. The focus of Ms. Boyko's responsibilities at Medivation was to develop digital marketing strategies and build digital marketing capabilities – Ms. Boyko was hired by Medivation to lead its digital marketing initiative. At Pfizer, however, Ms. Boyko no longer led the development of digital marketing capabilities since that function was already performed by Pfizer Centers of Excellence.

18. In short, the digital marketing initiative that Ms. Boyko was hired to lead at Medivation was already in place at Pfizer. Thus, Ms. Boyko's primary responsibility disappeared after the Pfizer takeover. This fact was confirmed for Ms. Boyko in several conversations with Pfizer managers who told her that her role at Medivation was duplicative of multiple Pfizer Centers of Excellence.

19. At Medivation, Ms. Boyko was part of the Commercial and expanded Global team working on the market launch of an important new product, Talazoparib. At Pfizer, however, Ms. Boyko no longer had any responsibility for Talazoparib.

20. Ms. Boyko was also a key leader for XTANDI strategic planning at Medivation. After December 2016, however, Ms. Boyko was not part of any strategic work on XTANDI. All strategic work regarding XTANDI's expanded indications and clinical trials was happening at Pfizer in New York and no legacy Medivation employees were involved.

21. At Medivation, Ms. Boyko was responsible for developing a strategy for using the

digital channel for clinical trial recruiting. After November 2016, Ms. Boyko no longer had any duties or responsibilities at Pfizer for digital channel clinical trial recruiting. Medivation Clinical Operations was folded into the Pfizer Clinical organization, which was completely separate from the Commercial organization to which Ms. Boyko was assigned at Pfizer.

22. Ms. Boyko managed a digital marketing budget of about $12 million at Medivation. She was responsible for preparing the budget, presenting the budget to Executive leadership, making the business case for the proposed budget, budget forecasting, and meeting budget goals. At Pfizer, Ms. Boyko did not make budget decisions or manage the digital marketing budget.

23. By her claim letter dated April 13, 2017, Ms. Boyko gave Pfizer notice of a triggering event under the Plan, namely a material decrease in her duties or responsibilities. By email dated May 15, 2017, Pfizer notified Ms. Boyko that it "does not intend to take steps to cure any conditions" cited in Ms. Boyko's claim.

24. Pfizer denied Ms. Boyko's claim by letter dated May 18, 2017.

25. By letter dated July 13, 2017, Ms. Boyko submitted her administrative appeal of the claim denial. By letter dated August 8, 2017, Ms. Boyko supplemented her administrative appeal.

26. By letter dated September 11, 2017, Defendants denied Ms. Boyko's administrative appeal.

27. At least three other former Medivation employees filed claims for Change in Control Termination severance benefits under the Plan following the Pfizer takeover. Upon information and belief, a legacy Medivation HR representative completed a document entitled "Employee Severance Plan HR Information Form" in connection with the other Change in Control Termination severance benefit claims in order to assist the Pfizer Administrative Committee in evaluating the claims. However, no "Employee Severance Plan HR Information Form" was prepared in connection with Ms. Boyko's claim.

28. The Plan provides that receipt of benefits under the Plan is subject to a participant executing and returning a Release of Claims in a form acceptable to the Company within 60 days

after the date of the termination of a participant's employment. Ms. Boyko's administrative appeal stated that in exchange for Pfizer approving her claim for severance benefits, Ms. Boyko would execute a Release of Claims in a form acceptable to Pfizer.

29. Ms. Boyko will execute a general release in consideration for the severance benefits she is entitled to under the terms of the Plan.

30. Plaintiff has exhausted her administrative remedies, and any further administrative proceedings would be futile.

31. Plaintiff is entitled to de novo review of her claim for benefits.

## FIRST CLAIM FOR RELIEF

### [Claim for Benefits Pursuant to ERISA § 502(a)(1)(B) against All Defendants]

32. Plaintiff incorporates Paragraphs 1 through 31 as though fully set forth herein.

33. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

34. Plaintiff is entitled to benefits under the Defendant Plan.

35. Defendants, and each of them, have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder. Defendants, and each of them, have failed to pay Plaintiff benefits to which she is entitled under the terms of the Plan.

36. Plaintiff is entitled to benefits under the terms of the Plan in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court grant the following relief:

A. Declare that Plaintiff is entitled to benefits under the Plan in an amount to be proven at trial;

B. Order Defendants, and each of them, to pay benefits to Plaintiff under the terms of the Plan, plus prejudgment interest;

C. Declare that Defendants, and each of them, have violated the terms of the Plan;

D. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant

to ERISA § 502(g), 29 U.S.C. §1132(g); and

E. Provide such other relief as the Court deems equitable and just.

Dated: January 12, 2018                                Respectfully Submitted,

FEINBERG, JACKSON, WORTHMAN & WASWOW LLP

By:   /s/ Daniel Feinberg
      Daniel Feinberg

FEINBERG, JACKSON, WORTHMAN & WASOW LLP
383 4th Street, Suite 201
Oakland, CA 94607
Telephone: (510) 269-7998
Facsimile: (510) 269-7994

Attorneys for Plaintiff